## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT KNOXVILLE

### MARCH 1999 SESSION

FILED

September 28, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE**, | * | C.C.A. NO. 03C01-9805-CR-00167 |
| Appellee, | * | WASHINGTON COUNTY |
| v. | * | Hon. Lynn W. Brown, Judge |
| **TIMOTHY V. BOWLING**, | * | (Arson) |
| Appellant. | * | |

For Appellant:

James T. Bowman
128 E. Market St.
Jonesborough, TN  37659

For Appellee:

John Knox Walkup
Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN  37243-0493

R. Stephen Jobe
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN  37243-0493

Joe C. Crumley
Assistant District Attorney General
P.O. Box 38
Jonesborough, TN  37659

OPINION FILED: _____

AFFIRMED

NORMA MCGEE OGLE, JUDGE

## OPINION

On March 21, 1995, the appellant, Timothy V. Bowling, was convicted by a jury in the Washington County Criminal Court of arson, a class C Felony.[1] On June 2, 1995, the trial court sentenced the appellant as a Range II multiple offender to an effective sentence of ten years incarceration in the Tennessee Department of Correction.

In this appeal as of right, the appellant presents the following issues for our review:

(I) Whether the evidence is sufficient to sustain the appellant's conviction of arson; and

(II) Whether the trial court erred by ruling that the appellant's prior convictions of felony nonsupport, stalking, and secreting personal property were admissible for impeachment purposes.

Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

## I. Factual Background

The conviction at issue in this case occurred as a result of a fire on May 23, 1994, at 603 Davis Street in Johnson City, Tennessee, the residence of Sonya Price. The record reflects that, prior to the fire, the appellant and Price, although never married, had a sporadic twelve-year relationship that produced two children. In 1990, the relationship between the appellant and Price had deteriorated to the point that Price sought an order of protection against the appellant.[2] During the next several years, the appellant and Price maintained separate residences, and

---

[1] The appellant was originally tried on January 30 and 31, 1995. That trial resulted in a mistrial.

[2] Price also testified that in 1988 the appellant intimidated her into falsifying an automobile accident report in order to obtain the insurance money.

2

their relationship became more volatile.

Price testified on behalf of the State that in April 1994, after she and one of their children testified against him, the appellant pled guilty in the Washington County Criminal Court to two counts of felony nonsupport and one count of stalking. The trial court ordered the appellant placed on probation. Almost immediately thereafter, Price began to have serious problems with the appellant. The problems primarily consisted of numerous threatening phone calls to Price. She testified that the appellant not only threatened her, but also their children. Because she was afraid the appellant would harm the children, Price took them to her mother's home in Illinois. Moreover, Price stated that she was afraid to stay alone at her own residence because she feared that the appellant would harm her. As a result, at night Price stayed with friends and at a Salvation Army Shelter. The appellant continued to try to contact Price by calling her residence and leaving messages on her answering machine.

On the afternoon of May 22, 1994, Price went to her home between 3:00 p.m. and 5:00 p.m. to obtain her clothes so that she could spend the night with her friend, Rose Dunlap. She did not return to her home until the morning of May 23, 1994, after receiving a call from fire and arson investigators who advised her that her house had burned. When Price arrived at her residence, she was told that three of her four cats had died in the fire. Moreover, her bedroom was in disarray and her clothes had been "cut up." Price also discovered writing on an interior wall which read "U R DEAD." That same morning, Price received a letter with the return address marked "H. Brown." H. Brown is one of Price's former boyfriends. Upon inspection of the letter, she recognized is as being the appellant's handwriting.[3] The

---

[3] The appellant subsequently admitted to writing the letter.

3

letter contained the following message: "For now I am the teacher, and I am the preacher. When I am done with your mind you will know what you have learned. You will know what it means to be fucking burnt."

Additionally, Price testified that her telephone bills showed that two telephone calls had been made from her residence at 1:54 a.m. and 1:55 a.m. on May 23, 1994. The calls were made to the residence of her brother, David Vaught, in Bloomington, Illinois. Price testified that she had not made the calls, but that she had left her brother's telephone number on a note pad next to the telephone.

Finally, Price recalled an incident at the Black and Tan Club, which occured in April 1994, approximately one month before the fire. Price testified that she went to the club with her brothers, David Vaught and Ricky Vaught. While at the club, an altercation ensued between her brothers and the appellant. At the conclusion of the fight, Price heard the appellant state, "I've got a bullet for your sister." She did not hear the appellant make any remarks about her residence.

David Vaught, testified on behalf of the State. Vaught testified that in May 1994, sometime after midnight central time, he received two telephone calls. When he answered the first call, no one responded. However, upon answering the second call, Vaught recognized the caller's voice as belonging to the appellant. The appellant told Vaught, "your sister is in a world of hurt," and then hung up the telephone.

Vaught further testified that prior to the telephone call, in April 1994, he had visited with family and friends in Johnson City. During his visit, he accompanied Price and his brother, Ricky Vaught, to the Black and Tan Club in Johnson City.

4

While there, he and his brother were involved in a fight with the appellant.

Next, the State introduced the testimony of Robert George, a taxi cab driver, who stated that on May 23, 1994, between midnight and 1:00 a.m., he observed the appellant outside Nashville Sound, a local nightclub. During a brief conversation, the appellant told George that he was going to visit friends on Boone Street, which is also in the direction of Price's house. Approximately thirty to forty minutes later, George observed the appellant walking back toward the Nashville Sound parking lot.

The State produced two additional witnesses to the altercation at the Black and Tan Club. Debra Buford, the bartender at the Club, testified that after the fight, she heard the appellant say that he, "would burn Davis street down." In addition, Otis Robinson, the owner of the club, testified that after the fight between the appellant and David Vaught and Ricky Vaught, he heard the appellant repeatedly say that he was going to "burn Davis Street down."

Additionally, the State produced the testimony of Dr. Larry Miller, a questioned documents expert, who stated that he had compared known exemplars of the defendant's handwriting to the letter that Price received the morning after the fire, and also the writing on the wall of Price's residence. Dr. Miller positively identified the handwriting of the letter as matching the known handwriting exemplars of the appellant. However, because the "U R DEAD" writing on the wall contained a small number of letters, all of which were capitalized, he was unable to make a conclusive match as to that writing. Nevertheless, because there were no significant disimilarities between the wall writing and the appellant's known exemplars, he could not rule out the defendant as the source of the writing.

5

Regarding the investigation of the fire, the State produced the expert testimony of Steve Shell and George Leonard, the Johnson City Fire Marshalls who investigated the fire at Price's residence. Leonard arrived at the scene on May 23, 1994, at approximately 5:30 a.m. After investigating the residence and conducting a reconstruction of the position of the furniture in the basement, he concluded that the fire originated on a bed in the basement of the home. Although he was unable to determine when the fire started, Leonard concluded that the fire was intentionally set and assigned the follow up investigation to Steve Shell.

Shell testified that he arrived at 603 Davis Street on May 23, 1994, at approximately 6:00 a.m. Shell first examined the exterior of the house and noted minimal damage. However, upon entering the residence, he observed smoke damage and also noted the phrase "U R DEAD" written on an interior wall. Based upon his investgation, Shell was able to determine that the fire originated in an area around a bed in the basement. Shell testified that he did not detect the use of accelerants and was unable to pinpoint an exact time when the fire started because of the manner in which it had burned. However, Shell estimated that the fire started no more than eight to nine hours before its discovery at approximately 5:00 a.m. Based upon his investigation of the house, including an examination of wiring and electrical boxes, Shell determined that the fire was intentionally set.

Additionally, Shell investigated the possibility that the fire was caused by the owner for insurance purposes. However, he noted that the residence appeared to be occupied. Also, personal property was damaged and pets were killed as a result of the fire. Based on these observations, Shell concluded that there was nothing to indicate that the owner had set the fire in order to obtain insurance proceeds.

6

In defense, the appellant offered the testimony of his sister, Joyce Dixon. Dixon recalled that the appellant and Price had lived together in 1992. She testified that, when she observed the appellant and Price together, Price did not appear to be afraid of the appellant.

Robin Tatem, whose daughter is the appellant's niece, testified that the appellant and Price lived together in December 1992. Specifically, she remembered a party at Price's residence in January 1993 at which time the appellant and Price were living together. Tate also testified that she heard Price complain that the appellant was deliquent in his child support payments. According to Tate, Price stated that she "would get him in jail one way or another."

The appellant also offered the testimony of Rex Campbell, a former inmate who had been in jail at the same time as the appellant. Campbell testified that he wrote the poem containing the line, "You will know what it means to be fucking burnt." Campbell recalled that he had written the phrase about a relationship in which he was mistreated. Further, Campbell testified that, after the appellant read the poem in jail, he asked Campbell if he could copy the poem. On cross-examination, Campbell testified that he recalled the defendant stating that he would "get even" with Price.

Additionally, the appellant offered proof in support of an alibi defense. Philip Bowling, the appellant's brother, testified that the appellant came home around 2:00 a.m. on May 23, 1994, and fell asleep on the couch. He next saw the appellant at approximately 9:00 a.m. as the appellant was leaving for work.

Arthur Welch, a friend of the appellant's, testified that on May 23, 1994, he

7

was at the home shared by the appellant and Phillip Bowling. Welch testified that the appellant came home at approximately 2:00 a.m. and fell asleep on the couch. He did not notice anything unusual about the appellants behavior. Walter Brady, the appellant's step-father, also testified that he observed the appellant asleep on the couch at the appellant's residence at approximately 5:00 a.m. on the morning of May 23, 1994.

Finally, Percel Fain, the appellant's brother in-law, testified that he lives in the vicinity of Davis Street and that the Nashville Sound night club is an eight to ten minute walk from Davis Street.

## II. Analysis

### A. Motion for New Trial

As a preliminary matter, we must first determine whether the issues raised have been waived by the untimely filings of the appellant's motion for new trial and notice of appeal.

A motion for new trial must be filed "within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This is a mandatory filing period which cannot be extended. Tenn. R. Crim. P. 45(b). The trial court does not possess jurisdiction over an untimely filed motion for new trial. State .v Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (citations omitted). "The trial judge's erroneous consideration [and] ruling on a motion for new trial not timely filed . . . does not validate the motion." Id. (citing State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989)). An untimely filed motion for new trial "not only results in the appellant losing the right to have a hearing on the motion, but it also deprives the appellant of the opportunity to argue on appeal any issues that were or should have been

8

presented in the motion for new trial." Id. (citations omitted). On appeal, waiver of these issues occurs pursuant to Tenn. R. App. P. 3(e), which states:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties, or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived.

However, this court may address issues which would result in outright dismissal of the prosecution, such as the sufficiency of evidence. See Dodson, 780 S.W.2d at 780; State v. Williams, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984). In addition, this court may review the record for plain errors when necessary to do substantial justice. Tenn. R. Crim. P. 52(b).

In the instant case, the trial court entered the order of sentence on June 2, 1995 and the appellant filed a motion for new trial on July 10, 1995, more than 30 days after sentencing. This court lacks the authority to waive the timely filing of a motion for new trial. See State v. Seyler, No. 01C01-9801-CR-00050, 1999 WL 357348, at *2 (Tenn. Crim. App. at Nashville, June 4, 1999); State v. Williams, No. 02C01-9710-CR-00388, 1999 WL 2848, at *6 (Tenn. Crim. App. at Jackson, January 5, 1999); State v. Wallace, No. 01C01-9711-CC-00526, 1998 WL 670627, at *4 (Tenn. Crim. App. at Nashville, September 30, 1998); State v. Brannan, No. 01C01-9704-CC-00148, 1998 WL 242453, at *3 (Tenn. Crim. App. at Nashville, May 15, 1998). Furthermore, this court has consistently held that counsel's untimely filing of a motion for new trial is imputed to the appellant for the purpose of waiver. See Dodson, 780 S.W.2d at 780; Williams, 675 S.W.2d at 501. Therefore, the issue concerning the trial court's admission of prior convictions, which could only result in the granting of a new trial and not dismissal of the prosecution, is waived

9

and the only issue that remains for our consideration is the sufficiency of the evidence.

In addressing the appellant's sufficiency issue, we are faced with another problem stemming from the failure to file a motion for new trial in a timely manner. A notice of appeal is required to be filed with the clerk of the trial court within thirty days after the date of entry of the judgment or order from which relief is sought. Tenn. R. App. P. 4(a). Timely filing of a motion for new trial tolls this period until the entry of the order denying the motion for new trial. Tenn. R. App. P. 4(c). See also State v. Lock, 839 S.W.2d 436, 440-41 (Tenn. Crim. App. 1992).

In the present case, because the untimely motion for new trial was a nullity, it did not toll the thirty-day period for filing a notice of appeal. See State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). As stated previously, the trial court entered the order of sentence on June 2, 1995, and the appellant filed an untimely motion for new trial on July 10, 1995. After the appointment of new counsel, the appellant filed a second motion for new trial on October 9, 1996. The trial court conducted a hearing and subsequently denied the motion on August 6, 1997. The notice of appeal was filed on September 3, 1997.

Of course, Tenn. R. App. P. 4(a) provides that the notice of appeal document is not jurisdictional and that timely filing may therefore be waived in the interest of justice. See also State v. Bilbrey, 816 S.W.2d 71, 75 (Tenn. Crim. App. 1991); Williams, No. 02C01-9710-CR-00388, 1999 WL 2848, at *6. We find that this is an appropriate case to waive the timely filing requirement for the notice of appeal. Accordingly, we will address the sufficiency of evidence issue.

10

## B.  Sufficiency of the Evidence

The appellant contends that the record contains insufficient evidence to sustain his conviction of arson.  Specifically, the appellant argues that the State's proof is entirely circumstantial and does not raise more than a suspicion that the appellant may have been responsible for the offense.

In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial.  In essence, a jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that "no reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Although the evidence of the appellant's guilt is circumstantial in nature, a criminal offense may be established by circumstantial evidence alone.  State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958); State v. Lequire, 634 S.W.2d 608, 614 (Tenn. Crim.

11

App. 1987).  However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant."  State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).  In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt."  Id. at 613.

While following the above guidelines, this court must remember that the jury decides the weight to be given to circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury."  Marable v. State, 313 S.W.2d at 457; see also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993); State v. Coury, 697 S.W.2d 373, 377 (Tenn. Crim. App. 1985); Pruitt v. State, 460 S.W.2d 385, 391 (Tenn. Crim. App. 1970).

With respect to the appellant's conviction of arson, the applicable statute provides:

> (a) A person commits an offense who knowingly damages any structure by means of fire or explosion:
> (1) Without the consent of all persons who have a possessory, proprietary, or security interest therein;. . . .

Tenn. Code Ann. § 39-14-301(a)(1) (1997).  In this case, the jury convicted the appellant of arson pursuant to an indictment charging that the appellant "did unlawfully and knowingly damage a house located at 603 Davis Street . . . without the consent of all persons who had a possessory, proprietary, or security interest

12

therein. . . ."

We conclude that the State adduced ample evidence to convict the appellant of arson. Although the appellant contended that he had also been a resident at the Davis Street house, there was ample evidence to the contrary. The State presented proof that, after the appellant's convictions of felony nonsupport and stalking in April 1994, the appellant began to threaten Price and one of her children, who had testified against him in those cases. Moreover, shortly after the appellant's release from custody, the appellant was involved in an altercation with Price's brothers. Immediately following the altercation, the appellant repeatedly threatened to "burn Davis Street down" and also said that he had "one bullet left in his gun," referring to Price.

Additionally, the State presented the testimony of Robert George, who observed the appellant within walking distance of Price's residence between midnight and 1:00 a.m. on the night of May 22 and the early morning hours of May 23, 1994. Furthermore, David Vaught's testimony, along with Price's testimony and telephone records, established that the appellant made two telephone calls from Price's residence to David Vaught's residence in Illinois in the early morning hours of May 23, 1994, thus placing the appellant at the scene of the fire at a time consistent with the start of the fire. Shell's testimony established that the fire began no more than eight to nine hours before its discovery at 5:00 a.m.

Furthermore, the expert testimony of the fire and arson investigators, George Leonard and Steve Shell, established that the fire in Price's residence had been intentionally set. They also opined that the evidence showed no indications that the fire was caused by the owner for insurance purposes.

13

Finally, the questioned document expert, Dr. Larry Miller concluded that the appellant wrote the letter containing the line, "you will know what it means to be fucking burnt." Dr. Miller's testimony also confirmed that there were no significant dissimilarities between the appellant's handwriting and the "U R DEAD" writing on the interior wall of Price's residence.

We conclude that the evidence in this case is sufficient to sustain the appellant's conviction for arson.

Accordingly, the judgment of the trial court is affirmed.

_____
Norma McGee Ogle, Judge

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
Cornelia A. Clark, Special Judge